200.50

FILED
2020 JUN 17 PM 3:33
HOWARD G. HOGAN

**IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE**

| | | |
|---|---|---|
| 481343 HATCHER HILL II, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| 974041 v. | ) | No. 200401-3 |
| | ) | |
| 1481344 JCM KENTUCKY CYCLE, LLC, | ) | |
| 1481345 MICHAEL D. OLANDER, JR. and | ) | |
| JOHN G. JANSZEN | ) | |
| 1481346 Defendants. | ) | |

**COMPLAINT**

Plaintiff, Hatcher Hill II, LLC, a Tennessee limited liability company ("Plaintiff"), by and through counsel, for cause of action against Defendants, JCM Kentucky Cycle, LLC, Michael D. Olander, Jr. and John G. Janszen ("Defendants") states as follows:

## I. PARTIES

1. Plaintiff is a Tennessee limited liability company with its principal place of business located in Knox County, Tennessee at 311 S. Weisgarber Road, Knoxville, Tennessee 37919.

35 D to Atty

2. Defendant, JCM Kentucky Cycle LLC ("Cyclebar") is a Delaware limited liability company with an office and place of business in Knox County, Tennessee and may be served through its registered agent, JCM Kentucky Cycle, LLC at 5430 Homberg Drive, Knoxville, Tennessee 37919.

3. Defendant, Michael D. Olander, Jr. ("Olander") is a resident of North Carolina and may be served at 135 E. Martin Street, Raleigh, North Carolina 27601.

4. Defendant, John G. Janszen ("Janszen") is a resident of Kentucky and may be served at 4010 Finn Way, Suite 120, Lexington, Kentucky 40502.

5. Jurisdiction and Venue are appropriate in the court based upon the fact that

EXHIBIT
tabbies
3

Plaintiff has offices located in Knoxville, Knox County Tennessee, the premises which is the subject of the Lease (as defined below) are located in Knoxville, Knox County Tennessee in which JCM operates a health club in Knoxville, Knox County Tennessee and all acts complained of in this Complaint occurred in Knoxville, Knox County Tennessee.

6. On June 28, 2017, the Plaintiff and Cyclebar entered into that certain Shopping Center Lease Agreement, a copy of which is attached hereto as Exhibit "A" (the "Lease") with respect to the demise of an approximately 3,023 square foot premises commonly known as 5430 Homberg Drive, Knoxville, Tennessee 37919 (the "CycleBar Premises").

7. Olander and Janszen personally guaranteed the obligations of CycleBar to the Plaintiff pursuant to the Lease.

8. In April, May and June of 2020, Cyclebar failed to remit payment of the rent due to Plaintiff.

9. Plaintiff provided notice of the default to Cyclebar as set forth in the Lease, a copy of which is attached hereto as Exhibit "B".

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully prays for the following relief:

1. That proper process be issued and served upon the Defendants requiring them to answer this Complaint within the time required by law;

2. That this Court decree that the Defendants breached the Lease and award Plaintiff possession of the Cycle Bar Premises.

3. That this Court decree that the Defendants breached the Lease and award Plaintiff recovery of all damages suffered by Plaintiff as a result of the breach of the Lease including all amounts all attorneys' fees costs, and expenses to the Lease and/or this cause of action.

4. That this Court grant Plaintiff such other and further relief as may be deemed necessary and/or appropriate.

Respectfully submitted,

**HOWARD & HOWARD, P.C.**

By: ______________________________
Joshua B. Bishop (BPR #023511)
4820 Old Kingston Pike
Knoxville, TN 37919
(865) 588-4091
Attorney for Hatcher Hill II, LLC

**COST BOND**

We acknowledge ourselves as surety for all court costs and taxes in this case in accordance
with T.C.A. § 20-12-120, this the 2nd day of June 2020.

HOWARD & HOWARD, P.C.

By: ______________________________
Joshua B. Bishop

# EXHIBIT A

## SHOPPING CENTER LEASE AGREEMENT

THIS SHOPPING CENTER LEASE AGREEMENT (the "Lease") made and entered into this 28th day of June, 2017, by and between **HATCHER HILL II, LLC**, a Tennessee limited liability company or assigns (referred to as "Landlord") and **JCM KENTUCKY CYCLE LLC d/b/a CYCLEBAR** (referred to as "Tenant");

WITNESSETH:

1. **Premises:** Landlord hereby leases Premises to Tenant, and Tenant leases and accepts certain Premises known as 5430 Homberg Drive, Knoxville, Tennessee 37919 located in a shopping center (the "Shopping Center" or "Center") known as Homberg Plaza, in Knoxville, Tennessee (the "Demised Premises" or "Premises") herein being approximately:

Three Thousand and Twenty Three (3,023) square feet, as shown on the site plan attached as Exhibit A.

Landlord shall deliver the Premises to Tenant in substantial conformity with Exhibit B. Tenant hereby acknowledges that Landlord has made no representations regarding the compliance of the Premises with any and all applicable codes and ordinances or the sufficiency of the Premises for Tenant's permitted use provided however that Landlord represents and warrants that the Premises, including its walls, floors, foundations, ceilings, and roof (the term "Premises as used in this provisions and elsewhere in this Lease shall include the walls, floors, foundations, ceilings, and roof) shall be structurally sound and water tight as of the commencement of the term and that the Premises will remain structurally sound and water tight during the term of this Lease at the Landlord's sole cost and expense. The term "Center" or "Shopping Center", for the purposes of this Lease, shall mean the entire development, parking facilities, common facilities, and the like on the property shown on the site plan attached hereto as Exhibit A and incorporated herein by reference, and the Premises are a portion of the Center. The term "Common Areas" means parking areas, driveways, entrances and exits thereto, service roads, loading facilities, sidewalks, ramps and landscaped areas. Common Areas shall also include (without limiting the same) underground utilities, sewers, drains, and any other facilities provided for the general or beneficial use of the tenants or other occupants of the Center, and the maintenance, repair and/or replacements thereof. All Common Areas shall at all times be subject to the exclusive control and management of Landlord. Landlord shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to the use of all Common Areas providing the same are uniformly administered and enforced. The Tenant shall have the right, in common with the other tenants in the Center, to the non-exclusive use of the Common Areas. The Premises do not include any portion of the Common Areas of the Center including, without limitation, the sidewalk in front of the Premises and the service area to the rear of the Premises. Tenant shall not use the Common Areas adjacent to the Premises for sale or display of merchandise without the prior written consent of Landlord. Landlord shall have the exclusive right at any and all times to close any portion of the Common Areas to make repairs, changes or additions thereto, and to change the size, area or arrangement of the parking areas or the lighting thereof, and to enter into agreements with adjacent owners for cross-easements for parking, ingress, egress, delivery, and the installation of utility lines. Notwithstanding the foregoing, Landlord shall not reduce the number of parking stalls at the Shopping Center below the number required by local codes and ordinances subject to all applicable variances and overlays. Tenant and its employees shall park their motor vehicles in such areas as Landlord shall from time to time designate as employee parking areas. Should Tenant fail to cause its employees to park as provided, Landlord shall have the right to tow such violating vehicles at any time after the second written notice of violation. Non-operative vehicles are not permitted at the Center. Any such non-operative vehicle belonging to Tenant or its employees may be removed by Landlord at the expense of Tenant, for storage, or for public or private sale, at Landlord's option, and Tenant shall have no right or recourse against Landlord thereafter. Tenant agrees that all loading and unloading shall be conducted so as not to interfere with businesses of the other tenants in the Center, nor will Tenant unreasonably block or obstruct any portion of the Common Areas, or use any portion of the Common Areas for permanent or temporary storage, without the prior written consent of Landlord.

2. **Term:** The original term of this Lease shall be for a period of approximately ten (10) years (the "Base Term") from the "Commencement Date" hereinafter provided unless sooner terminated hereby. Said Base Term, and Tenant's

obligation to pay Minimum Rent and Additional Rent (collectively referred to as "Rent"), shall commence on (referred to as "Commencement Date") the date which is one hundred fifty (150) days after Landlord delivers the Premises to Tenant ("Delivery Date") with Landlord's Work, if any, substantially complete and Tenant has obtained all permits and approvals necessary for commencement of its construction and improvements so long as Tenant applies for such permits within forty-five (45) days of the Effective Date of this Lease and will diligently pursue permits. (the "Fixturing Period Expiration") in accordance with Exhibit B. In the event Tenant is unable to secure the required permits within sixty (60) days of application, Landlord may elect to assist Tenant. If neither party can obtain permits within one hundred twenty (120) days of initial application, either party may elect to terminate. The Landlord shall provide Tenant with at least forty-five (45) days prior written notice of the Delivery Date and thereafter, in no event shall actual delivery date of the Premises be prior to the date provided to Tenant as the Delivery Date.

In the event the Fixturing Period Expiration does not occur on the first day of the month, then the Base Term shall commence on the first day of the month next succeeding. However, the Tenant shall pay Rent for the fractional month, if any, on a per diem basis (calculated on the basis of a thirty (30) day month) until the first (1st) day of the month when the term commences, and thereafter the Rent shall be paid in equal monthly installments in advance on the first day of each month during the term of this Lease. Tenant shall pay any Rent payment for a fractional month on the Commencement Date if the fractional month consists of fifteen (15) or more days. In the event the fractional month consists of less than fifteen (15) days, Tenant shall pay any Rent payment for said fractional month on the first (1st) day of the month succeeding such fractional month. The term "Lease Year" means the twelve (12) month period beginning on the Commencement Date, and each twelve (12) month period thereafter.

In the event that Tenant is given access to the Premises prior to the Commencement Date for the purpose of installing fixtures or for any other purpose permitted by Landlord, such early entry will be at Tenant's sole risk and subject to all the terms and provisions of this Lease as though the Commencement Date had occurred, except for the payment of Base Rent which shall commence on the Commencement Date. Notwithstanding the preceding sentence, it is specifically agreed and understood that Tenant shall pay all charges for "real estate taxes", "insurance premiums", "common area expenses", water, electricity and all other utilities serving the Premises from the date upon which Tenant is notified that the Premises are available for Tenant's work (or from the date when Tenant commences to perform its work, if earlier) until the Commencement Date (any partial month shall be prorated).

3. **Minimum Rent:** Tenant shall pay to the Landlord as Minimum Rent the amounts specified in the Rent Addendum attached hereto and made a part hereof, without notice, set-off or demand.

4. **Pro-rata Share of Real Estate Taxes, Insurance Premiums and Common Area Maintenance Expenses:** Tenant shall remit to Landlord as Additional Rent its Pro-Rata Share, as hereinafter defined, multiplied by the real estate taxes, insurance premiums, and common area maintenance expenses incurred by the Landlord in connection with the operation of the Shopping Center. Tenant's Pro-Rata Share shall be a fraction, the numerator of which shall be the number of square feet in the Premises and the denominator of which shall be the total number of leasable square feet in the Shopping Center for which the Landlord is obligated to make payment, the Tenant acknowledging and agreeing that the area leased by other tenants may be separately assessed for tax purposes, or such other tenants may obtain their own insurance or maintain their own Common Areas. Tenant shall pay its Pro-Rata Share of the above expenses within twenty (20) days after receipt of a bill therefor.

The term "real estate taxes" shall mean all taxes and assessments (special or otherwise) levied, accrued or assessed during Tenant's occupancy against the Shopping Center (land, buildings and improvements as the same may be enlarged or reduced from time to time), assessment and taxes based on gross rentals, and other taxes arising out of the use and/or occupancy of the Premises now or hereafter imposed by federal, state or local governmental authority or any other taxing authority having jurisdiction over the Shopping Center (including expenses directly incurred by Landlord in contesting the validity of, in seeking a reduction in, or seeking to prevent an increase in any such tax(es) or assessment(s)), but shall exclude capital stock, estate or inheritance taxes personal in nature to Landlord.

In addition to Tenant's proportionate share of real estate taxes, Tenant shall pay any and all sales, excise, gross receipts and other taxes (not including, however, Landlord's income taxes) levied, imposed, accrued or assessed during Tenant's occupancy by the state in which the Shopping Center is situated or any political subdivision thereof or other taxing authority (be it federal, state, local or otherwise) upon any amounts payable hereunder. Notwithstanding anything to the contrary in this Article or elsewhere in this Lease, in no event shall Tenant be liable for any portion of the Landlord's cost or expense for any late fee which may be assessed upon the Landlord for any tax obligation incurred in connection with this Article, or for any federal, state, or local income tax which the Landlord may incur in connection with any income it may realize as a result of its ownership of and business within the Shopping Center, or for any franchise tax or gross receipts tax which the Landlord may incur, nor shall any portion of any costs incurred as a result of the foregoing be assessed against the Tenant as part of its Common Area Maintenance Costs as defined elsewhere in this Lease.

The term "insurance premiums" shall mean the premiums charged for fire and extended coverage insurance on the improvements constructed and/or installed by the Landlord in the Center and for rent insurance thereon, together with premiums charged for liability insurance on the Common Areas in the Shopping Center, and any other reasonable insurance costs incurred in the normal course of business for similar size shopping centers. The Landlord in its sole and absolute discretion shall have the right to determine the limits and the deductibles of said insurance policies.

The term "common area maintenance expenses" shall mean the total cost and expense incurred in operating, maintaining, cleaning and repairing the Common Areas including, without limitation, landscaping and gardening, maintenance, repair and replacement of the parking lot, line painting, lighting, traffic control, if any, sanitary control, removal of snow, trash, rubbish and garbage, the cost of personnel to implement such services and to direct parking and to police the Common Areas, music or other communication systems for the Shopping Center and a reasonable sum (not to exceed five percent of Rent collected) to cover the management costs relative to the operation of the Common Areas and the Shopping Center. Costs of capital repairs or replacements shall be amortized over the life of the repair or replacement in accordance with generally accepted accounting principles and these annual amortization costs shall be included within Common Area Maintenance Expenses. Provided, however, notwithstanding anything in this Lease to the contrary, Landlord's common area maintenance expenses shall not include: any costs properly classifiable as capital costs, or any amortization thereof, costs incurred in connection with the original construction or expansion of the Shopping Center, including any interest or payments on any financing; cost of correcting defects in the initial design or construction of the Shopping Center or expansion; any costs or expenses incurred by Landlord in bringing the Shopping Center into compliance with any applicable federal, state or local statutes, codes, ordinances or rules including, without limitation, the Americans with Disabilities Act ("ADA"); costs relating to the restoration and/or repair obligations of Landlord with respect to Shopping Center or the Premises; reserves for anticipated future expenses; legal and other fees; leasing commissions; advertising expenses; any items for which Landlord is reimbursed by insurance; any bad debt loss, rent loss or reserves for bad debts or rent loss; the cost of providing improvements within the Shopping Center of any other tenants; all interest or penalties incurred as a result of Landlord's failure to pay any bill as it shall become due; the cost of leasing anything other than items whose purchase price would be included in reimbursable expenses hereunder; any cost related to the operation of Landlord as an entity rather than the operating of the Shopping Center including the cost and formation of the entity, internal accounting, legal matters, preparation of tax returns, etc.; the cost of any utility, maintenance, service or repair provided to any other premises in the Shopping Center; any costs incurred by Landlord with respect to other premises in the Shopping Center occupied or occupiable by other tenants. Tenant shall be solely responsible for expenses directly related to its particular use of the Premises (such as garbage disposal for a restaurant) and any common area maintenance expenses incurred due to its particular use which are over and above the ordinary course of business for the Center. Notwithstanding anything herein to the contrary, management costs shall be assessed based upon the Rent payable by Tenant, not Tenant's Pro Rata Share as defined above. In addition to the foregoing, it is expressly acknowledged that Tenant's Actual Share shall not increase by more than three percent (3%) per calendar year during the Term on a cumulative basis. This cap in CAM shall be applicable after the first (1st) full year of the Lease Agreement. All increases attributable to increases in real estate taxes, insurance premiums, snow and ice removal and utilities shall not be included in the foregoing cap on increases to the Tenant's Actual Share and Tenant agrees that it shall be responsible for the actual increases to each of these categories of expenses. Tenant's Estimated Share for 2017 is $4.50 per square foot.

5. **Estimation of Taxes, Insurance and Common Area Maintenance Charges:** Landlord may, at its option, estimate for each succeeding calendar year the Tenant's Pro-Rata Share of the expenses enumerated in Section 4 hereof along with Tenant's management fee (the "Tenant's Estimated Share") Landlord may require the Tenant to pay, with each monthly installment of Minimum Rent for such succeeding calendar year, one-twelfth (1/12) of the Tenant's Estimated Share. Landlord may, at any time and from time to time, revise the amount due as Tenant's Estimated Share to cover any increase not previously factored into the annual estimate of Tenant's Pro-Rata Share or Tenant's management fee. Upon Tenant's receipt of a revision to Tenant's Estimated Share, Tenant shall pay Landlord, as Additional Rent, the revised amount. Within ninety (90) days after the expiration of such calendar year, the Landlord shall forward to the Tenant an itemized statement showing the Tenant's actual share of such expenses ("Tenant's Actual Share"). Landlord's failure to provide an itemized statement within such ninety (90) day period shall in no way excuse Tenant from its obligation to pay its pro rata share of the expenses enumerated in Section 4 hereof or constitute a waiver of Landlord's right to bill and collect such pro rata share from Tenant in accordance with this Section. Should the Tenant's Actual Share differ from the Tenant's Estimated Share, then, within thirty (30) days after the date of Landlord's itemized statement, either Landlord shall refund to Tenant any amount paid in excess of the Tenant's Actual Share, or Tenant shall remit to Landlord any amount by which the Tenant's Estimated Share was deficient.

Landlord shall keep books and records of the accounting of Tenant's Pro Rata Share of Common Area Maintenance Charges in accord with reasonably accepted accounting principles consistently applied from year to year. Tenant shall have the right, at any reasonable time by giving Landlord sixty (60) days prior written notice not to exceed one time per Lease year, to examine such books and records (and supporting and related documentation) or have them audited, at the Tenant's expense not to exceed $1500, except that if any such examination or audit discloses a deficiency of more than five percent (5%) from the amount set forth in any notice furnished by Landlord to Tenant, then Landlord shall pay the actual cost of Tenant's examination or audit, and shall immediately pay to Tenant such deficiency.

6. **Tenant's Use and Operation:** The Demised Premises shall be used and occupied by Tenant solely as a cycle bar fitness studio that offers combinations of exercises both on and off the cycles together with the sale of exercise apparel, health related beverages, alcoholic beverages and energy bars and for no other use without Landlord's prior written consent, not to be unreasonably withheld. Tenant shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy of the Premises, and shall not violate in any manner any of the exclusive or restrictive use rights of record affecting the Center or granted by Landlord to any other occupants in the Shopping Center, or in the outparcels to the Shopping Center, which exclusive or restrictive use provisions are available for Tenant inspection. In the event Tenant violates said restrictive uses or exclusives, Tenant agrees to (i) immediately cease violating said restrictive uses or exclusive and (ii) hold Landlord harmless from all claims, losses, expenses and liabilities arising out of said violations. Tenant agrees that a shopping center is an interdependent enterprise, that the Shopping Center's success is dependent on the continued operation of Tenant's business, and that the character and quality of the Shopping Center is enhanced by the continued occupancy of the Premises. Tenant shall not be required to continuously operate within the Premises; provided that if Tenant closes the Premises for business to the public for 60 or more consecutive days (excluding time closed for casualty, remodeling, repairs and/or inventory), then Landlord in its sole discretion may terminate this Lease. Tenant shall not conduct or permit any fire, bankruptcy, auction or "going out of business sale" (whether real or fictitious) in the Premises, or utilize any unethical method of business operation.

Tenant shall keep and maintain the Premises in a neat and clean condition and shall operate its business on the Premises in a professional, first class manner, e.g., well-stocked with merchandise, staffed with courteous, helpful, knowledgeable and non-threatening employees, with an interior décor installed and maintained in keeping with other stores in the Shopping Center. It is of material importance to Landlord that Tenant shall not use or occupy the Premises in any manner or for any purpose which would injure the reputation or impair the present or future value of the Premises, the Shopping Center and/or the neighborhood in which the Shopping Center is located. NOTWITHSTANDING the fact the Tenant has timely made payment of Rent and all other charges hereunder, in the event Tenant fails to comply with the above requirements within thirty (30) days after written notice from Landlord,

then Landlord shall have, in addition to any and all remedies herein provided, the right to declare Tenant in default, thereby allowing Landlord the right to pursue all remedies allowed hereunder.

Tenant shall not suffer, allow or permit any excessive vibration or noise in excess of 80 dba in any adjacent space, or permit any excessive, light, odor or other effect to emanate from the Premises, or from any machine or other installation therein, or otherwise suffer, allow or permit the same to constitute a nuisance or otherwise interfere with the safety, comfort or convenience of Landlord or any of the other tenants of the Shopping Center or their customers, agents or invitees or any others lawfully in or upon the Shopping Center. Upon receipt by Landlord of a bona fide complaint about excessive noise coming from the Premises, excluding any hypersensitive party whose complaint is unreasonable in the context of noise normally associated with fitness tenants in a retail commercial shopping center, Tenant agrees that it will take actions to reduce the noise level emanating from its space within seven (7) days after the first written notice from Landlord. Such actions may include, but are not limited to, lowering the volume level of music being played in the Leased Premises and any other reasonable actions or improvements to the Premises to minimize excessive noises from transferring from the Premises through adjacent walls into adjacent spaces. Such actions, although not an exclusive list, will be deemed "commercially reasonable" for the purposes of this Lease; provided that Tenant acknowledges that if Landlord receives a second complaint within ninety (90) days after Tenant resolves the first complaint then Landlord may hire and engineer (at Tenant's expense) and Landlord can either i) perform the engineer's suggested modifications and bill Tenant for the cost of the same or ii) require Tenant to perform the engineer's suggested modifications. In the event that Tenant fails to comply with the foregoing requirements within a reasonable time after written notice, it is expressly acknowledged that Tenant shall be in default hereunder. Provided (i) Tenant installs the sound proofing measures required by the engineer; (ii) the sounds emanating from the Leased Premises are associated with the normal operation of a workout and fitness studio; and (iii) the sound is not in violation of any noise or other ordinances for retail shopping centers applicable to the Shopping Center; then such sounds will not be deemed to be a default of this Lease. Tenant shall not store, display, sell or distribute any dangerous materials (including without limitation fireworks) unless specifically permitted in this Lease. If Tenant's patrons litter or damage the Common Areas of the Center, or any other Premises, Tenant shall be responsible for the prompt disposal of such litter or prompt repair of such damage. Tenant shall not use or occupy the Premises or do or permit anything to be done which shall prevent Landlord from obtaining at standard rates any insurance required or desired.

7. **Utilities:** Landlord warrants that all utilities are available to the Premises with tap on and hook up available at the exterior wall of the Premises. Tenant shall pay promptly, as and when the same shall become due and payable, all water rents, rates and charges, all sewer rents and all charges for electricity, gas, heat, air conditioning, ventilating, lighting systems, sprinkling systems and other utilities supplying the Premises. Tenant shall transfer all separately metered services into Tenant's name upon the request of Landlord, but in no event later than the date on which Tenant accepts possession of the Premises. Landlord shall in no way be liable for any loss, expense, or damage (whether direct or indirect) that Tenant may sustain or incur by reason of any change, failure, interference, disruption, interruption, or defect in the supply or character of any utilities furnished to the Premises, regardless of its duration, or if the quantity or character of the utilities supplied by the local utility service provider(s) is no longer available or suitable for Tenant's requirements.

Any such change, failure, interference, disruption, interruption, defect, unavailability, or unsuitability shall not: (i) constitute an actual or constructive eviction of Tenant, in whole or in part; (ii) entitle Tenant to any abatement or diminution of Minimum Rent, Additional Rent, or any other costs due from Tenant pursuant to this Lease; (iii) relieve or release Tenant from any of its obligations under this Lease; or (iv) entitle Tenant to terminate this Lease. Tenant hereby waives all benefits of any applicable existing or future law permitting the termination of this Lease due to any such change, failure, interference, disruption, interruption, defect, unavailability, or unsuitability as mentioned above.

8. **Signs:** All signs placed on any exterior door, wall or window of the Premises shall comply with the Sign Addendum attached hereto. Tenant agrees to maintain such signs or advertising matter as approved by Landlord in good condition and repair. All signs shall comply with any sign criteria provided by Landlord to Tenant and with applicable ordinances or other governmental restrictions and the determination of such requirements and the prompt compliance therewith shall be the responsibility of the Tenant. All signs of Tenant visible from the Common Areas of the Shopping Center

shall be in good taste and shall conform to the standards of design, motif, and decor from time to time uniformly established by Landlord for the Shopping Center.

Notwithstanding anything contained herein to the contrary, subject to the reasonable approval of Landlord and all applicable laws, codes, rules, and regulations, for a period not to exceed the (12) weeks prior to Tenant opening for business and for the (12) weeks after Tenant has opened for business in the Leased Premises, Tenant shall be permitted to hang a "Coming Soon" banner and a "Now Open" banner respectively on the exterior of the Leased Premises. Furthermore, subject to the reasonable approval of Landlord and all applicable laws, codes, rules, regulations, during the course of the Lease Term, Tenant may hang professionally prepared promotional banner signs, which are a part of Tenant's national signage program, on the exterior of the Leased Premises, not more frequently than four (4) times per year, and with each such display lasting no longer than two (2) weeks. Landlord shall not be responsible for any loss or damage to any such banner signage. Tenant shall be responsible for the cost of any repairs necessitated by the hanging of the banners on the exterior of the Leased Premises. In the event that Landlord must repair any damage caused by the hanging of banners and exterior storefront signage, Tenant shall reimburse Landlord such amounts as additional rent within ten (10) days of invoice

9. **Tenant's Duty to Repair; Alterations:** Except for the repairs to be performed by Landlord, Tenant shall keep and maintain in good order, condition and repair (including any such replacement and restoration as is required for that purpose) the Premises and every part thereof and any and all appurtenances thereto wherever located, including, without limitation, the exterior and interior portion of all doors, plate glass, store front, all plumbing and sewage facilities within the Premises including free flow up to the main sewer line, fixtures, heating and air conditioning, and electrical systems exclusively serving the Premises (whether or not located in the Demised Premises), sprinkler systems within the Premises, walls, floors and ceilings, meters applicable to Tenant's Premises, and all installations made by Tenant under the terms of this Lease and any Exhibits thereto, as herein provided. Tenant shall replace all filters on the heating and air conditioning equipment on a timely basis and shall do regular maintenance. Tenant shall contract for on-going maintenance of heating and air conditioning equipment and shall be responsible for the cost of repair and replacement of the heating, ventilation and air conditioning system. Tenant shall not make any alteration of, or addition or improvement to, the Premises without securing the Landlord's prior written consent. Tenant shall use the roofing contractor designated and/or approved by Landlord to make any and all roof penetrations. Tenant shall be responsible for any and all work required to reinstate Landlord's roof warranty and/or repair any and all leaks or other damage associated with Tenant's roof penetrations. Tenant shall save Landlord harmless on account of claims for mechanics', materialmen's, or other liens in connection with any work by Tenant, and any such liens shall exist only against Tenant's leasehold interest. Tenant shall keep and maintain the Premises in accordance with all directions, rules and regulations (including but not limited to Title I and Title III of the Americans with Disabilities Act of 1990 (ADA), Fair Housing Act of 1988 (FHA), if applicable, or other similar statute) of the proper officials of the government agencies having jurisdiction, at the sole cost and expense of Tenant, and Tenant shall comply with all requirements of law, by statute, ordinance or otherwise, affecting the Premises and all appurtenances thereto. The Landlord agrees to jet clean the sewer line if the line is not replaced as part of the renovations.

If (i) Tenant does not repair properly as required hereunder and to the reasonable satisfaction of Landlord, or (ii) Landlord, in the exercise of its reasonable discretion, determines that emergency repairs are necessary, or (iii) repairs or replacements to the Shopping Center and/or common areas are made necessary by any act or omission or negligence of Tenant, its agents, employees, subtenants, assignees, concessionaires, contractors, invitees, licensees, or visitors, then, in any of such events, Landlord may make such repairs without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures, or other property, or to Tenant's business by reason thereof, and upon completion thereof, Tenant shall pay Landlord's cost for making such repairs plus ten percent (10%) for overhead, upon presentation of a bill therefore, as Additional Rent.

Tenant will discharge any lien or claim for payment filed against the Center or any part thereof for work done for Tenant or materials furnished to Tenant, within thirty (30) days after such lien is filed. If Tenant fails to keep this covenant, in addition to any other remedies available to Landlord, Landlord may at its option bond or discharge such lien or claim, in which event Tenant agrees to pay Landlord a sum equal to the amount of the lien or claim thus

discharged by Landlord, which amount will be deemed to be Additional Rent. Further, if Tenant fails to keep this covenant, Landlord may, at its option, terminate the Lease on thirty (30) days written notice to Tenant.

10. **Surrender of Premises and Holding Over:** At the termination of the Base Term, or any renewal term thereof, the Tenant does agree to deliver the Premises to the Landlord, in a broom-clean condition, with all carpets to be cleaned, all damage to the interior walls to be repaired, all heating, ventilating and air-conditioning systems to be in a state of good repair and condition for its age, all plumbing systems free of debris and operable, and all restrooms clean and operable, with all toilets, sinks, and vanities intact and in a state of good condition and repair. In the event the Tenant has been engaged in the operation of a restaurant, or has provided food service to its patrons, all sinks, dishwashers, coolers, oven-hoods and built-in appliances shall remain with the Premises and shall not be removed by the Tenant. Further, in the event the Landlord has provided Tenant with any tenant improvement monies, all televisions, stoves, cookware, tables, chairs, and booths shall not be removed by the Tenant at the termination of the lease, but rather shall be the property of the Landlord. Except as provided above, Tenant, during the last thirty (30) days of such term, shall remove all its trade fixtures (which includes specialty cabinets, lighting, pads, and mirrors), and shall repair any damage to the Premises caused by removal of such items. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the lease term. Any items remaining in the Premises on the termination date of this Lease shall be deemed abandoned for all purposes and shall become the property of Landlord.

In addition to the foregoing, within fifteen (15) days after the expiration or sooner termination of the term of this Lease, Tenant shall remove all of its interior and exterior signage, and all installations appurtenant thereto, including electrical hook-ups, and the Premises and Center shall be restored to its condition before the installation of such signage. Tenant shall also have its sign application (e.g., vinyl lettering) removed from any pylon or monument signs serving the Premises or the Center. In the event Tenant fails to remove any such signage and to restore the Premises, Center and pylon/monument signage as required herein, Landlord, without further notice to Tenant, may remove and restore at Tenant's sole cost and expense together with a sum equal to ten percent (10%) of such cost and expense to cover Landlord's overhead in making such repairs for Tenant. Tenant shall pay such removal and restoration costs within ten (10) days after receipt of Landlord's invoice therefore. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the lease term.

If Tenant shall default in surrendering the Premises, Tenant's occupancy subsequent to such expiration, whether or not with the consent or acquiescence of Landlord, shall be deemed to be that of a tenancy at will and in no event from month to month or from year to year, and it shall be subject to all the terms, covenants, and conditions of this Lease applicable thereto, except that Minimum Rent shall be 150% the amount payable in the last year of the Base Term, or any renewal term thereof, and no extension or renewal of this lease shall be deemed to have occurred by such holding over.

11. **Landlord's Duty to Repair:** At Landlord's cost, Landlord shall keep and maintain in good repair the foundation, exterior walls (except for cleaning, non-structural repairs and painting, all of which shall be included in common area maintenance expenses) and roof (except as noted in Section 9 hereof) of the building in which the Premises are located and the structural portions of the Premises which were installed by Landlord, exclusive of doors, door frames, door checks, windows, and window frames located in exterior building walls. Landlord shall not be called upon to make any other improvements or repairs of any kind upon the Premises and appurtenance. Any of the foregoing repairs required to be made by reason of the negligence of Tenant, its agents, etc., as above described, shall be the responsibility of the Tenant notwithstanding the provisions above contained in this Section.
Notwithstanding the foregoing, if Landlord fails to make any repairs to the Premises required by Landlord, after thirty (30) days written notice from Tenant to Landlord of the necessity for same (except in the case of an emergency, in which case as soon as reasonably practical after Landlord receives written notice from Tenant), and the default has a material detrimental impact on Tenant's ability to conduct its business, Tenant may make the repairs on Landlord's behalf and upon delivery to Landlord of a paid bill by Tenant for any repairs permitted to be made by it pursuant to this Article, Landlord shall reimburse Tenant for the reasonable expenses incurred by Tenant for the repair.

12. **Liability of Tenant; Insurance:** Tenant shall protect, indemnify and save Landlord harmless from and against all and any liability and expense of any kind, including reasonable attorney's fees, arising from injuries or damages to persons or property in, on or about the Premises arising out of or resulting in any way from any act or omission of Tenant, its agents, invitees, servants and employees, in the use of the Premises during the term of this Lease. Tenant's obligation under this Section of this Lease to indemnify, defend, and hold harmless shall include any loss, cost, claim, or liability incurred by Landlord as a result of Tenant's breach or purported breach of Tenant's obligations under Title I and Title III of ADA, FHA, if applicable, or other similar statute.

Tenant shall keep in force throughout the Term: (a) a Commercial General Liability Insurance policy or policies covering the Premises and the use and occupancy of the same with a limit of not less than $1,000,000.00 per occurrence and not less than $2,000,000.00 in the annual aggregate, or such larger amount as Landlord may prudently require from time to time, covering bodily injury, property damage liability, personal injury, and $1,000,000.00 products/completed operations aggregate; (b) All Risk or Special Form coverage protecting Tenant against loss of or damage to all personal property, decorations, trade fixtures, furnishings, equipment, improvements, plate glass, and all contents within the Premises to the full replacement value of the property so insured; and (c) Business Interruption Insurance with limit of liability representing loss of at least approximately six months of income.

Each of the aforesaid policies shall (a) be provided at Tenant's expense; (b) name the Landlord, Landlord's ground lessor, if applicable, Landlord's mortgagee, and Landlord's managing agent as additional insureds; (c) be issued by an insurance company or companies licensed to do business in the State where the Premises is located and with a minimum AM Best (or such other equivalent) rating of "A:VII"; and (d) provide that said insurance shall not be cancelled unless thirty (30) days' prior written notice (ten days for non-payment of premium) shall have been given to Landlord or Landlord's managing agent; and evidence of such insurance shall be delivered to Landlord or Landlord's managing agent by Tenant upon the Commencement Date and at least thirty (30) days prior to each renewal of said insurance.

Whenever Tenant shall undertake any alterations, additions or improvements in, to or about the Premises ("Work") the aforesaid insurance protection must extend to and include injuries to persons and damage to property arising in connection with such Work, without limitation, including liability under any applicable structural work act, and such other insurance as Landlord and Landlord's managing agent shall reasonably require; and evidence of such insurance must be delivered to Landlord or Landlord's managing agent prior to the commencement of any such Work.

Tenant agrees not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy. It is agreed between the parties that in the event the insurance rates applicable to fire and extended coverage insurance covering the Premises shall be increased by reason of any use of the Premises made by the Tenant, then Tenant shall pay to Landlord such increase in insurance as shall be occasioned by said use.

Tenant agrees that if any improvements or property owned by it and located in, on or about the Premises shall be damaged or destroyed by any peril, including, but not limited to, fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow, or leaks from any part of the Premises or from the pipes, appliances, or plumbing works or from the roof, street, or subsurface or from any other place or by dampness, Landlord and the other tenants in the Center shall not have any liability to Tenant, nor to any insurer of Tenant, for or in respect of such damage or destruction, and Tenant shall require all policies of risk insurance carried by it on its property in, on and about the Premises to contain or be endorsed with a provision in and by which the insurer designated therein shall waive its rights of subrogation (including deductibles) against Landlord and other such tenants.

13. **Damage or Destruction by Fire or Other Casualty:** If at any time, the Premises become totally untenantable by reason of damage or loss by fire or other casualty and such fire or other casualty shall not have been caused by the negligence or wrongful act or omission of Tenant, Tenant's servants, agents, licensees, or invitees, the Rent shall abate until the Premises shall have been restored to tenantable condition, and thereafter for a period of 150 days for Tenant to perform its upfit and fixturing, but nothing herein is to be construed as requiring Landlord to restore or rebuild the Premises. If the Premises are so damaged, but not to the extent that they are totally untenantable, Tenant shall continue

to occupy same or the tenantable portion thereof, and the Rent shall abate proportionately in the ratio that the unusable portion bears to the entire Premises. In the event of a loss from fire or other casualty, Landlord shall have an election not to rebuild or recondition the Premises, which election shall be exercised by written notice thereof to Tenant, given within ninety (90) days from date of said loss. If Landlord exercises such election, this Lease shall cease and terminate, effective on the date of such loss, and Tenant shall pay the accrued Rent up to the date of such loss, or Landlord, if the Rent has been paid beyond such date, will refund to Tenant the proportionate part of any such Rent prepaid, and thereupon this Lease shall become null and void, with no further obligation on the part of either party hereto, even though the building may at a later date be rebuilt, restored or reconditioned. No damage or destruction shall allow Tenant to surrender possession of the Premises, nor affect Tenant's liability for the payment of Rent, except as specifically provided in this Lease.

14. **Tenant Assignment and Subletting:** Tenant hereby acknowledges that Landlord has entered into this Lease in order to obtain the unique attraction of Tenant's trade name, the unique services and/or merchandising mix and product lines associated with Tenant's business and unique combination of Tenant's apparent operating expertise and financial integrity. Neither Tenant nor any court or officer thereof nor any receiver or trustee in bankruptcy shall assign, sublease, license, sell, transfer or in any way mortgage, pledge or hypothecate (collectively "Assign") all or any of (i) its interest in this Lease or (ii) its interest in and to the Premises or any part thereof, without Landlord's prior written consent in accordance with this Section. Landlord's consent may be withheld in Landlord's reasonable discretion. Whether or not Landlord grants consent, Tenant will pay Landlord's reasonable legal fees in connection therewith, which will be deemed to be Additional Rent, not to exceed $1,500.

If Landlord consents to an Assignment (or if the Lease is assigned without Landlord's consent), the terms and conditions of this Lease will in no way be waived or modified, including, without limitation, the use which Tenant or its assignee may make of the Premises as set forth in Section 6 above. Tenant and any Guarantor(s) will remain fully liable for all obligations under the Lease, including without limitation, those obligations arising before and after the Assignment. Further, any assignee will expressly assume all of the Tenant's obligations under the Lease. Landlord's consent will not be deemed to consent to any further transfer by either Tenant or an assignee. However, if Landlord consents to an assignment by Tenant, Landlord will not unreasonably withhold its consent to any request by a guarantor_while the guaranty is still in effect, to be released from his guaranty agreement if the principal owner of assignee executes a similar guaranty agreement as the guarantor_while his guaranty is still in effect, and presents audited financial statements affirming such new guarantor's strength is equal to or better than the guarantor while his guaranty is still in effect.

For the purpose of this Lease, the term Assignment also includes the following, whether accomplished directly or indirectly: (i) if Tenant is a partnership or limited liability company, the withdrawal or change, voluntary, involuntary or by operation of law, of a majority of the partners or members, or a transfer of a majority of partnership interests or membership interests, in the aggregate, or the dissolution of the partnership or limited liability company; (ii) if Tenant is a closely held corporation (i.e., a corporation the stock of which is not publicly held and not traded through an exchange or over the counter), the dissolution, merger, consolidation, or other reorganization of Tenant; and (iii) the sale or other transfer of more than fifty percent (50%) of the voting share of Tenant or the sale, mortgage, hypothecation or pledge of more than fifty percent (50%) of Tenant's net assets.

Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right, without Landlord's consent, to assign this Lease or sublet the Premises as follows (a "Permitted Transfer"): (a) to a parent, subsidiary, affiliate, franchisee, licensee or similarly related entity which of Tenant; (b) in connection with a merger, acquisition, reorganization or consolidation or private placement involving the majority of Tenant's assets being sold, reorganized, consolidated or acquired; (c) in connection with the sale of the majority of Tenant's corporate stock, membership interests or assets; or (d) to any corporation or other business entity purchasing a majority of any of the assets of Tenant.

If Landlord or a court of competent jurisdiction should ever permit Tenant to assign its interest in this Lease, sell this Lease or sublet or license the Premises, or a portion thereof, for rentals in excess of the Minimum Rent reserved

hereunder, Tenant shall pay the sales price or all of such excess rent (which amount shall equal the difference between the Minimum Rent provided for herein and the excess rent) to Landlord as Additional Rent.

Notwithstanding anything to the contrary contained in this section, so long as Tenant is not in default of this Lease, Tenant shall have the right to assign this Lease or sublease the Premises to a Bona Fide Franchisee or to Franchisor, subject to the following conditions: (1) Tenant shall give Landlord written notice at least forty-five (45) days prior to the effective date along with all documentation necessary to verify the conditions required by this Section; (2) Tenant shall remain fully liable during the remainder of the Term; (3) any such assignment or sublease shall be subject to the terms, covenants and conditions of this Lease and any such assignee or sublessee shall expressly assume the obligations of Tenant under this Lease by a document prepared by Landlord; (4) the use of the Premises shall be restricted to the Permitted Use; (5) Tenant has delivered the Review Fee to Landlord; and (6) the Bona Fide Franchisee must have a tangible net worth, computed in accordance with generally accepted accounting principles, at least equal to Tenant's tangible net worth at the execution of the Lease, and the Bona Fide Franchisee must provide comparable Guarantor(s). The term "Bona Fide Franchisee" shall be defined as a franchisee of Franchisor, in accordance with a bona fide and legally valid franchising program established by Franchisor, which shall provide for, among other things, adequate and ongoing training, supervision, and control over its franchisees. Furthermore, any sublease with a Bona Fide Franchisee or an assignment to the Franchisor shall be subject to the following additional conditions: (i) Tenant shall retain a reversionary interest in the Lease; (ii) the sublease shall be subordinate to the Lease; and (iii) the sublessee shall have a net worth and business experience necessary, as determined by Landlord, to operate a successful business in the manner and quality permitted under this Lease

15. **Default and Remedies:**

**(i) Events of Default.** At Landlord's option, Tenant will be in breach of this Lease and Landlord may declare a default upon the occurrence of any of the following events:

a. Failure by Tenant to pay in full any Rent payment or other sum payable hereunder within ten (10) days after written notice but no more then twice per year.;

b. Failure by Tenant to perform any of the terms or conditions of this Lease, other than the payment of money, for a period of thirty (30) days after notice thereof to Tenant by Landlord or a longer period of time if the type, nature and extent of the repair cannot be done within a ten day period in which case a commercially reasonable time will be the standard, after receipt of written notice to Tenant,;

c. The insolvency of Tenant or the filing by Tenant of a voluntary petition in bankruptcy or for any other relief under the Bankruptcy Act, as amended, or under any other insolvency act, law, rule or regulation, state or federal, now or hereafter existing; the application by Tenant for, or the appointment with Tenant's consent or acquiescence of, a receiver or trustee of Tenant, or for all or a substantial part of the property of Tenant in, on or about the Premises, or of Tenant's interest in the Lease; the making by Tenant of any general assignment for the benefit of creditors of Tenant; or the inability of Tenant, or the admission of Tenant of the inability thereof, to pay the debts of Tenant as such mature;

d. The filing of any involuntary petition against Tenant in bankruptcy or for any other relief under the Bankruptcy Act, as amended, or under any other insolvency act, law, rule or regulation, state or federal, now or hereafter existing; the involuntary appointment of a receiver or trustee of Tenant or for all or for a substantial part of the property of Tenant in, on or about the Premises, or of Tenant's interest in the Lease; or the issuance of attachment, execution or other similar process against any substantial part of the property of Tenant, and the continuation of any of the foregoing for a period of forty-five (45) days undismissed, unbonded, or undischarged; or

e. The abandonment of the Premises as a going business by Tenant for any period exceeding thirty (30) consecutive days, regardless of whether Tenant continues to pay all Rent excluding times for remodeling (provided same was approved by Landlord in advance), repairs, casualty loss and force majeure.



Case 3:20-cv-00331-JRG-HBG Document 1-3 Filed 07/30/20 Page 13 of 50
PageID #: 42

f. The Premises are intentionally materially damaged or destroyed by Tenant, its employees, agents or contractors.

g. Tenant or any assignee or sublessee makes any use of the Premises other than that set forth in Section 6 hereof.

h. Tenant does or causes to be done any unauthorized construction in the Center or the Premises, or Tenant deviates from the plans and specifications for Tenant's work without the prior written approval of Landlord, or there exists any defective workmanship or materials in Tenant's work, which deviations or defects are not corrected within thirty (30) days after written notice thereof.

**(ii) Remedies.** Whenever any Event of Default shall have occurred, Landlord may, to the extent permitted by law, take any one or more of the following remedial steps.

a.. Apply the security deposit specified in the Security Deposit Addendum to Tenant's monetary obligations hereunder.

b. Re-enter the Premises with or without terminating this Lease and remove all persons and all or any property therefrom, by any suitable action or proceeding at law, or by force or otherwise, without being liable for any prosecution therefor or damages resulting therefrom, and repossess and enjoy the Premises, together with all additions, alterations and improvements.

c. Repair, alter, remodel and/or change the character of the Premises as it may deem fit.

d. At any time relet the Premises or any part or parts thereof, as the agent of Tenant or otherwise.

e. Landlord may, as Tenant's agent, without terminating this Lease, enter upon and operate the Premises, and Tenant hereby authorizes Landlord to take over and assume the management of the Premises for Tenant, holding Tenant liable for all amounts payable by Tenant hereunder.

f. Terminate this Lease (but such termination will not release Tenant from any of its obligations contained in this Lease, including those for the balance of the term then in effect at the time of such default).

g. Cure Tenant's default and assess against Tenant the cost of curing the default, as Additional Rent, which will be paid to Landlord within ten (10) days after Tenant's receipt of a bill therefore.

h. Landlord may take whatever action is available to Landlord at law or in equity, and in connection with such actions, recover any and all damages to Landlord for Tenant's violation or breach of this Lease.

No remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative, and shall be in addition to every other remedy given under this Lease or now or hereafter existing at law or in equity or by statute. Any other provisions of this Lease notwithstanding, any reentry and repossession of the Premises by Landlord will be deemed a termination of Tenant's right to possession of the Premises *only* and not a termination of the Lease, unless the Lease is concurrently expressly terminated by the Landlord in writing by notice to Tenant. No delay or omission by Landlord to exercise any right or power accruing upon any default of Tenant shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised by Landlord at any time, from time to time and as often as may be deemed expedient. In order to entitle Landlord to exercise any remedy reserved to it hereunder, it shall not be necessary to give any notice, other than such notice as is expressly required by this Lease. No payment by Tenant or receipt by Landlord of a lesser amount than the Minimum Rent or Additional Rent herein stipulated will be deemed to be other than on account of the earliest stipulated Rent, nor will any endorsement or statement on any check or

letter be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedies provided in this Lease.

In the event Tenant shall become a debtor in a case filed under Chapter 11 of the Bankruptcy Code, or in a case filed under Chapter 7 or 13 of the Bankruptcy Code which is converted to Chapter 11, Tenant's trustee or Tenant, as debtor-in-possession, must elect to assume this Lease within sixty (60) days from the date of the filing of the petition under Chapter 11 or conversion thereto, or Tenant's trustee or the debtor-in-possession shall be deemed to have rejected this Lease. Immediately thereupon Landlord shall be entitled to possession of the Premises without further obligation to Tenant or Tenant's trustee and this Lease, upon the election of Landlord, shall terminate, but Landlord's right to be compensated for damages (including, without limitation, damages pursuant to this Lease) and reasonable attorneys' fees in any such proceeding shall survive whether or not the Lease is terminated.

**(iii) Damages.** The exercise by Landlord of any right granted in Section 15(ii) above does not relieve Tenant from the obligation to make all Rent payments, and to fulfill all other covenants required by this Lease, at the time and in the manner provided herein. Landlord agrees to use commercially reasonable efforts to release the Premises and mitigate its damages In the alternative, in the event of default, Landlord may recover from Tenant damages as set forth below, which damages are cumulative with and in addition to any other right or remedy allowed under any law or provisions of this Lease:

a. Upon termination of Tenant's right of possession or upon termination of the Lease, Tenant throughout the remaining term will pay Landlord, no later than the last day of each month during the term, the then-current excess, if any, of the sum of the unpaid Rents and costs to Landlord resulting from such default by Tenant, over the proceeds received by Landlord from reletting, if any. Any excess rent or sums received from renting the Premises by Landlord as a result of Tenant's default will remain the sole property of Landlord but credited towards the amounts owed by Tenant. In addition to all other damages, Tenant will also pay to Landlord its reasonable Costs of Reletting which include, but are not limited to, all reasonable costs and expenses incurred by Landlord for any repairs, maintenance, changes, alterations and improvements to the Premises (whether to prevent damage or to prepare the Premises for reletting), brokerage commissions amortized over the term of the new lease with Tenant paying the portion attributable to the Term of this Lease, advertising costs, reasonable attorney's fees, and reasonable economic incentives given to a replacement tenant to enter into a lease.

b. In the alternative and at Landlord's option in the event of termination of Tenant's right of possession or termination of the Lease, Landlord may recover from Tenant:

i. All unpaid Rents and other charges as of the date possession is terminated. For purposes of this Subsection, "Rents and charges" include without limitation Minimum Rent, Percentage Rent, Additional Rent, and any other amount due to Landlord by Tenant under this Lease; *and*

ii. ; *and*

iii. The Cost of Reletting as defined in Subsection (iii)(a) above; *and*

iv. All other damages proximately caused by Tenant's failure to perform its obligations under this Lease.

Whether or not this Lease is terminated by Landlord or deemed terminated by any law or court decree, any such rent and other amounts which would have become due in the future ("Future Rent") cannot be accelerated (i.e., declared immediately due and payable) and Tenant will not be liable for any rent and other amounts payable under this Lease prior to the date the same would otherwise have become due in the absence of Tenant's default.

**(vi) Landlord's Default.**

a. If Landlord defaults in the observance or performance of any its duties, obligations or commitments to Tenant, as set forth under this Agreement, and said breach has not been cured within thirty (30) calendar days following written notice to Landlord, Landlord shall be in default of this Agreement. However, if the default cannot be cured by the payment of money and cannot with due diligence be wholly cured within the thirty (30) calendar day period, Landlord may have any longer period that is necessary to cure the default, so long as Landlord initiates a cure within the thirty (30) calendar day time period, prosecutes the cure to completion with due diligence, and advises Tenant from time to time, upon Pilot's request, of the actions that Landlord is taking and the progress being made.

b. If there is any Event of Default, which is allowed to go uncured by Landlord, Tenant may, at Tenant's sole discretion, (i) terminate this Lease, (ii) Tenant may cure such breach on Landlord's behalf and Landlord shall promptly reimburse Tenant, upon demand by Tenant, for all sums reasonably expended by Tenant to effect such cure (or Tenant may offset the cure amount from its rental payments until Tenant is reimbursed in full), or (iii) pursue any remedy or right it has available in law or equity.

16. **Mitigation of Damages:** Landlord will use commercially reasonable efforts to mitigate its damages. If Landlord attempts to relet the Premises, Landlord will be the sole judge as to whether or not a proposed tenant is suitable and acceptable.

17. **Collection and Attorney's Fees:** In the event that either party shall be required to take any legal action for the enforcement of any of the terms of this Lease, whether such employment shall require institution of collection, suit or other legal services required to secure compliance on the part of the defaulting party, the defaulting party shall be responsible for and shall promptly pay to the non-defaulting party the reasonable value of said collection costs, attorney's fees and expenses, court costs, and any and all other expenses incurred by the non-defaulting party as a result of such default.

18. **Litigation:** WITH RESPECT TO ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, TENANT HEREBY EXPRESSLY WAIVES THE RIGHT TO A TRIAL BY JURY. ANY CLAIM, RIGHT, OR DEFENSE BY TENANT THAT ARISES OUT OF THIS LEASE WILL BE BARRED UNLESS TENANT COMMENCES AN ACTION THEREON, OR INTERPOSES A DEFENSE BY REASON THEREOF, WITHIN ONE (1) YEAR AFTER THE DATE OF THE ACCRUAL OF SAID CLAIM, RIGHT OR DEFENSE.

19. **Condemnation:** If a portion of the Demised Premises shall be taken, as herein provided, for public improvements or otherwise, under the exercise of the right of eminent domain and the Premises shall continue to be reasonably suitable for the use which is herein authorized, then the Rent herein provided shall be reduced from the date of such taking in direct proportion to the reduction in usefulness of the Premises.

If the real estate hereby leased, or a part thereof sufficient to render the Demised Premises substantially unfit for the use herein authorized, shall be condemned or acquired by grant or otherwise, for the widening of streets or for other public improvements, or shall otherwise be taken in the exercise of the right of eminent domain, Tenant shall have the right, at Tenant's option, to terminate and cancel this Lease on thirty (30) days' prior written notice to Landlord, such notice to be given within sixty (60) days of the date of the taking, and Tenant shall be liable only for Rents and other charges accrued and earned to the date of surrender of possession of the Premises to Landlord and for the performance of other obligations maturing prior to said date.

Tenant shall not be entitled to participate in or receive any part of the damages or award which may be paid to or awarded Landlord by reason of a taking except where said award shall provide for moving or other reimbursable expenses for the Tenant under applicable statute.

20. **Landlord's Right of Entry:** Landlord reserves the right at all reasonable times during the Term of this Lease for Landlord or Landlord's agents, upon notice to Tenant, to enter the Premises for the purpose of inspecting and examining the same, and to show the same to prospective purchasers, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable. During the ninety (90) days prior to the

expiration of the Term of this Lease or any renewal term, Landlord may exhibit the Premises to prospective tenants or purchasers, and place upon the Premises the usual notices advertising the Premises for sale or lease, as the case may be, which notices Tenant shall permit to remain thereon without molestation.

Landlord shall provide Tenant with one (1) key to all existing exterior locks of the Premises. Additional keys shall be provided at Tenant's cost. In the event Tenant changes the exterior locks to the Premises at any time during the Base Term and/or any Option Terms, Tenant shall provide Landlord with a working key. In the event the Center is on a master key system, as selected in Landlord's sole discretion, Tenant agrees all exterior locks on the Premises shall be compatible with said master key system. If all keys to the Premises are not returned when Tenant vacates the Property, Landlord may charge a re-key charge in the amount of Two Hundred and Fifty Dollars ($250) which shall be Additional Rent hereunder.

21. **Quiet Enjoyment:** Landlord agrees that, if the Rent is being paid in the manner and at the time prescribed and the covenants and obligations of the Tenant are being all and singularly kept, fulfilled and performed, Tenant shall lawfully and peaceably have, hold, possess, use and occupy and enjoy the Premises so long as this Lease remains in force, without hindrance, disturbance or molestation from Landlord, subject to the specific provisions of this Lease.

22. Intentionally deleted..

23. **Subordination and Attornment:** Tenant hereby subordinates all of its right, title and interest in and under this Lease to the lien of any mortgage or mortgages, or the lien resulting from any other method of financing or refinancing, now or hereafter in force against the real estate and/or buildings of which the Demised Premises are a part. In the event of a foreclosure under any mortgage or deed of trust affecting the Premises or the building in which the Premises are located, or in the event of the termination of Landlord's interest or the eviction of Tenant under any ground or other underlying lease, the holder of the Note secured by any mortgage or deed of trust encumbering the Premises, or the purchaser at any foreclosure sale, shall have the option to recognize this Lease, in which event this Lease shall continue in full force and effect. In the event of any sale pursuant to any power of sale granted under any mortgage of deed of trust encumbering the Premises, or conveyance of title to the Premises by deed in lieu of foreclosure, the Tenant will attorn to the purchaser of the Premises and its successors and assigns. Tenant does covenant and agree to execute and deliver to Landlord within fifteen (15) days from date of request such Subordination Non-disturbance and Attornment Agreements (SNDAs) in reasonable form, as may be requested by Landlord provided, further, that Tenant shall not be required to effectuate such subordination unless the mortgagee or trustee named in such mortgage, deed of trust, or other encumbrance shall first agree in writing, for the benefit of Tenant, that so long as Tenant is not in default under any of the provisions, covenants, or conditions of this Lease on the part of Tenant to be kept and performed, that neither this Lease nor any of the rights of Tenant hereunder shall be terminated or modified or be subject to termination or modification except as herein otherwise provided, nor shall Tenant's possession of the Premises be disturbed or interfered with, by any trustee's sale or by any action or proceeding to foreclose said mortgage, deed of trust, or other encumbrances. Landlord shall obtain from any current or future lender, mortgagor, or transferee of any interest in the property, a Non-Disturbance Agreement whereby the Lender, mortgagee, or transferee agrees to attorn to the Tenant in the event of a default on the mortgage or transfer or sale of the property. The Non-Disturbance Agreement shall provide that the Lender, mortgagee, or transferee will agree to recognize the Tenant as its Tenant, provided the Tenant is not in default (as "default" is defined within this Lease and after the expiration of any relevant cure period) under the Lease at the time of any such foreclosure or transfer, and will agree not to disturb the Tenant in its quiet enjoyment of the Demised Premises.

24. **Notices:** All notices required or permitted by the terms of this Lease shall be in writing and shall be personally delivered, or sent by nationally recognized overnight commercial delivery service (provided a receipt is available with respect to such delivery), or mailed by first-class registered or certified mail, return receipt requested, postage prepaid. Any such notice, request, consent or other communications shall be effective on the date when it is received, if personally delivered, or on the date when it is deposited in the United States Mail or with such overnight delivery

service, in accordance with the provisions of this Section. All notices shall be addressed to Tenant at the Premises and addressed to Landlord at:

If to Tenant at: the Demised Premises

and

JCM Kentucky Cycle LLC attn: Lease Administrator
135 E. Martin Street
Raleigh, NC 27601

If to Landlord at: Hatcher Hill II, LLC
311 S. Weisgarber Road
Knoxville, TN 37919
Attn: Property Manager

Any address herein specified may be changed from time to time by either party by written notice given to the other party as above provided.

25. **Successors:** The provisions, covenants and conditions of this Lease shall bind and inure to the benefit of the legal representatives, successors and assigns of each of the parties, except that no assignment or subletting by Tenant without the written consent of Landlord shall vest any right in the assignee or sublessee of Tenant.

26. **Governing Law:** The Lease shall be governed by, and construed in accordance with, the laws of the State where the Premises are located.

27. **Landlord's Exculpatory Clause:** It is specifically understood and agreed that there shall be no personal liability of Landlord in respect to any of the covenants, conditions, or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to any right of offset allowed by law against any amounts due hereunder or to the equity of the Landlord in the Shopping Center for the satisfaction of Tenant's remedies, it being understood and agreed that the exculpation of Landlord (and its successors and assigns) shall be absolute.

28. **Relationship of the Parties:** Nothing contained in this Lease shall be deemed or construed as creating the relationship of principal and agent or of partnership or joint venture between the parties hereto, it being understood and agreed that neither the method of computing Rent nor any other provision contained herein nor any acts of the parties hereto shall be deemed to create any relationship between the parties other than that of Landlord and Tenant.

29. **Entire and Binding Agreement:** This Shopping Center Lease contains all of the agreements between the parties hereto and hereby supersedes all prior discussions, negotiations and agreements, whether oral or written. Tenant acknowledges that neither Landlord nor any broker has made any representations to or agreements with Tenant which are not contained in this Lease. This Lease may not be modified in any manner other than by agreement signed by all parties hereto or their successors in interest. The Tenant hereby covenants and agrees not to disclose or discuss with any third party the provisions, covenants, and conditions of this Lease without the prior written consent of the Landlord. In the event Tenant violates this covenant, Landlord reserves the right to either (i) terminate this Lease, or (ii) revoke any Rent or other concessions granted hereunder. The parties specifically agree that this Lease has been negotiated as an arm's length transaction, that each party had the benefit of being or the opportunity to be represented by legal counsel, and that no weight of construction shall be given to one party or another as the drafter of this Lease.



Case 3:20-cv-00331-JRG-HBG Document 1-3 Filed 07/30/20 Page 18 of 50 PageID #: 47

30. **Documentation:** Tenant does covenant and agree without cost to Landlord to execute and deliver to Landlord and/or Landlord's mortgagee within fifteen (15) days from date of request such supplemental documents, including estoppel certificates, SNDAs, in reasonable form, as may be requested by Landlord. Any such documents may be relied upon by any prospective purchaser or prospective tenant of the Premises, or any lender or prospective lender of the Landlord, or any assignee or prospective assignee of any lender thereof. If Tenant fails or refuses to furnish such documents within the time provided, it will be conclusively presumed that this Lease is in full force and effect in accordance with its terms and the Landlord is not in default.

31. **Guarantor(s):** Any guarantor(s), its successors, assigns, and legal representatives, executing this Lease hereby guarantees, unconditionally and absolutely to the Landlord, its successors and assigns, the full and faithful performance and observance of all obligations of Tenant arising hereunder, whether now existing or hereafter arising. The obligations of the guarantor(s) shall in no way be terminated, affected or impaired by reason of the assertion by the Landlord against the Tenant of any of the rights or remedies reserved to the Landlord pursuant to the provisions of this Lease, or the granting of any indulgence or extension of time to the Tenant, or by reason of the amendment, modification, hold over, renewal or extension by the Tenant of the Lease, to all of which the guarantor(s) hereby consents in advance. If this instrument is executed by more than one guarantor, the obligations of such guarantors shall be joint and several. Guarantor(s) does not require any notice of Tenant's nonpayment nonperformance, or nonobservance of the covenants, terms, and conditions of this Lease and hereby expressly waives the right to receive such notice. Insofar as the payment by Tenant of any sums of money to Landlord is involved, this guaranty is a guarantee of payment and not of collection, and shall remain in full force and effect until payment in full to Landlord of all sums payable under the Lease. Guarantor(s) waives any right to require that any action be brought against Tenant or that resort be had to any security or to any other credit in favor of Tenant, subordinates any liability or indebtedness of Tenant held by Guarantor(s) to the obligations of Tenant to Landlord under this Lease, and the benefit of any statute of limitations affecting Guarantor(s)' liability. Notwithstanding the foregoing, each Guarantor's liability hereunder shall be limited to an amount equal to i) the Rent (Base Rent plus Additional Rent) due hereunder for one (1) year of this Lease plus ii) an amount equal to the unamortized portion of the Tenant Finish Allowance paid to Tenant by Landlord hereunder plus iii) the unamortized portion of all leasing commissions paid to the brokers involved in the procurement of this Lease. The measuring period to calculate the Rent portion of the foregoing calculation shall be the 12 months which immediately preceded the date of default. In addition to the foregoing, all amortization calculations shall be made on a straight-line basis over the Base Term of this Lease. Notwithstanding the foregoing, Landlord shall have a duty to mitigate any damages incurred by Landlord resulting from a default by Tenant under the Lease beyond any applicable notice and cure period such that any mitigation shall also mitigate Guarantor's obligations pursuant to this Guaranty

32. **Addendum and Exhibits:** The Exhibits and Riders or Addendums, if any, affixed to this Lease are a part hereof for all purposes. In the event of any conflict, variation or discrepancy in the terms of this Lease and the terms of any Riders or Exhibits attached hereto (or in the event any Exhibits or Riders listed below are missing from Tenant's copy), the Exhibits or Riders contained in Landlord's original copy of the Lease shall control.

33. **Re-execution; Acknowledgment:** The Tenant and any guarantor, if any, agree that they will, on request of Landlord, re-execute this Lease if necessary to observe any legal formalities (e.g., acknowledgment) required under the laws of the state where the Premises are located.

34. **Late Payments:** If Tenant fails to pay, when due, any sum payable hereunder, interest will accrue from the date such payment is due at the interest rate generally announced in the Wall Street Journal, or similar publication, as the prime rate plus two percent (2%), and such interest together with a late charge Two Hundred Fifty and No/100 Dollars ($250.00) so overdue to cover the extra expense involved in handling such delinquency (not as a penalty) shall be paid by Tenant to Landlord at the time of payment of the delinquent sum. If there is no term such as prime rate utilized in the Wall Street Journal, or similar publication, then the rate most nearly similar to such shall be utilized. Landlord reserves the right to require payment in the form of cashier's check or money order after one or more of Tenant's checks have been returned by the bank unpaid. Tenant shall be charged a handling fee in the amount currently charged by local lending institutions for all checks returned for insufficient funds. All amounts due hereunder are cumulative.

35. **Captions, Underlining, Line-Outs:** The captions contained herein are for convenience and reference only and shall not be deemed as part of this Lease or construed as in any manner limiting or amplifying the terms and provisions of the Lease to which they relate. The underlining of certain portions of this Lease shall not mean that such portions are to be given any greater or lesser force or effect than the non-underlined portions. Any portion of this Lease which has been lined out was the agreement of the parties to eliminate and the language of any such lined-out provisions shall be given no force and effect whatsoever.

36. **Provisions Severable:** If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

37. **Hazardous Substances:** Tenant shall not generate, store, treat, dispose of, install or otherwise permit any Hazardous Substances on, in, or under or in any way related to the Premises, or any other portion of the Shopping Center or cause or permit any such generation, storage, treatment, disposal, installation or other use with respect thereto. Tenant shall fully indemnify and hold Landlord harmless from any liability, damage, cost or expense that Landlord might otherwise suffer from Tenant's failure to fully comply with this provision. This indemnity shall survive expiration or other termination of this Lease. "Hazardous Substances" means and includes any of the substances, materials, elements or compounds that are contained in the list of hazardous substances adopted by the United States Congress or the Environmental Protection Agency or any substances, materials, elements or compounds affected by any other federal, state, or local statute, law, ordinance, code, rule, regulation, order or decree now or at any time hereafter in effect, regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic, dangerous, restricted or otherwise regulated waste, substance or material.

To the best of Landlord's knowledge, the Premises is not contaminated with any hazardous substances beyond acceptable levels as defined by the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980. To the best of the Landlord's knowledge, there is no litigation, investigation, inquiries, and other proceedings, rulings, orders or citations against Landlord, or threatened to be contemplated by government officials as the result of any actual or alleged failure of Landlord or the predecessors of Landlord to comply with a requirement of federal, state, local or foreign law, civil or common, or regulations relating to air quality, water quality, solid waste management, hazardous or toxic substances, or the protection of health or the environment on or about the Shopping Center

38. **Relocation to the Premises:** *Intentionally Omitted.*

39. **No Offer:** No version of this Lease transmitted to any prospective tenant by Landlord shall constitute an offer to lease or a reservation of or option for the Premises and this Lease shall only become effective upon execution and delivery thereof by Landlord and Tenant.

40. **Execution:** In the event TENANT does not execute and deliver this Lease to Landlord on or before ~~May 9, 2017~~ JUNE 30, 2017, then this Lease shall terminate, and shall be null and void for all purposes. MDO

41. Confidentiality. Landlord, and its principals, agents, employees and attorneys, agree to keep any and all financial statements of Tenant and Guarantors, including all information contained therein, strictly confidential, and shall not disclose, directly or indirectly, those terms to any other person or entity without first obtaining the prior written consent of Tenant or Guarantor, as applicable; provided, however, that consent shall not be required for any disclosure compelled by applicable laws, regulations or court orders. In the event of any violation of the preceding confidentiality requirements, Landlord agrees that Tenant and/or the Guarantors shall not have an adequate remedy at law and that such effected party shall be entitled to seek injunctive relief.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and date first above written.

Signed, sealed and delivered in the presence of:

**LANDLORD:**
**HATCHER HILL II, LLC**
a Tennessee limited liability company

By: ______________________
Timothy M. Hill
Its: Authorized Member

WITNESS:

**TENANT:**
**JCM KENTUCKY CYCLE LLC**
**d/b/a CYCLEBAR**

By: ______________________
Name: ______________________
Its: ______________________
Tax ID # ______________________
Date: 6/27/17

WITNESS:

**GUARANTOR:**

By: ______________________
Name Michael D. Olander, Jr., individually
Soc.Sec. [redacted]
Date: 6/27/17

WITNESS:

**GUARANTOR:**

Redacted

By: ______________________
Name: John G. Janszen, individually
Soc.Sec. [redacted]
Date: 5/19/17

**TENANT CONTACT INFORMATION:**
**(to be filled out at lease execution)**

Name: John Janszen

Address: 4010 Finn Way, Suite 120
Lexington KY 40502

Phone: (513) 616-3369

Email: john.janszen@cyclebarfritzfarm.com

## RENT ADDENDUM (FIXED ESCALATION)

The monthly Minimum Rent payable by Tenant hereunder shall be as follows:

**BASE TERM**

| Base Year(s) | psf | Minimum Rent per Month | Minimum Annual Base Rent |
|---|---|---|---|
| Year 1-5 | 24.00 | $6,046.00 | $72,552.00 |
| Year 6-10 | 26.40 | $6,650.60 | $79,807.20 |

Together with the payment of Minimum Rent, pursuant to the terms of the Lease to which this Rent Addendum is attached and made a part of as if fully incorporated therein, Tenant shall pay any rental tax, gross receipts tax, or any charge imposed upon Landlord based solely on the receipt or collection of rent. All Minimum Rent shall be paid in advance on the first (1st) day of each month at the address specified for notices to Landlord, such rent to be paid without notice, set-off, or demand.



Initials Landlord ____ Tenant ____

## OPTION TERM ADDENDUM

Provided that Tenant, is not in default in any respect hereunder beyond any applicable notice and cure period, , the Tenant shall have an option (the "Option") to lease the Premises after the termination of the Base Term for two (2) additional periods of five (5) years each upon the same terms and conditions set forth herein except as may be otherwise provided hereunder as applicable to the Option Terms. Tenant shall exercise the Option by giving notice to Landlord in writing by certified mail, return receipt requested, not less than one hundred twenty (120) days before the expiration of the Base Term and thereafter, not less than one hundred twenty (120) days prior to the expiration of each extension.

**OPTION 1**

| Option Year(s) | psf | Minimum Rent per Month | Minimum Annual Base Rent |
|---|---|---|---|
| Year 11-15 | 29.04 | $7,315.66 | $87,787.92 |

**OPTION 2**

| Option Year(s) | psf | Minimum Rent per Month | Minimum Annual Base Rent |
|---|---|---|---|
| Year 16-20 | 31.94 | $8,046.22 | $96,554.62 |



Initials Landlord ______ Tenant ______

## SECURITY DEPOSIT ADDENDUM

As security for the prompt and punctual performance of all obligations required to be performed hereunder by Tenant, Tenant shall, upon Lease execution, deposit with Landlord the sum of 00. 00/100 Dollars ($0.00), which shall, as provided below, either be applied to Rent or held as a security deposit until the expiration of the term. If Tenant is in default under this Lease beyond any applicable notice and cure period more than two (2) times within any twelve-month period, , then, without limiting Landlord's other rights and remedies provided for in this Lease or at law or in equity, the Security Deposit shall automatically be increased by an amount equal to the greater of: (i)two (2) times the original Security Deposit; or (ii) two (2) months Minimum Rent, which shall be paid by Tenant forthwith on demand. In the event of any default hereunder by Tenant, Landlord may utilize such deposit to offset either in whole or in part any obligations of Tenant hereunder. The covenants in the Security Deposit Addendum are personal covenants between Landlord and Tenant and are not covenants running with the land, and in no event will Landlord's mortgagee or any purchaser at a foreclosure sale of a sale in lieu of foreclosure be liable to Tenant for the return of the Security Deposit. Tenant shall not assign or encumber the Security Deposit or its interest therein, and neither Landlord nor its successors and assigns shall be bound by any attempted assignment or encumbrance. Landlord shall not be required to segregate such funds.

Check which is applicable

| | | |
|---|---|---|
| $0.00 | Applied to First Month's Rent | _____ |
| $0.00 | Held as security until expiration of Term | _____ |
| **$0.00** | **TOTAL DEPOSIT** | |



Landlord Tenant
Initials [signature] [signature]

## GROSS SALES REPORTING ADDENDUM

**Gross Sales Reporting:** At Landlord's sole discretion, it may require Tenant to provide its annual gross receipts, no more than once during any calendar year. The term "gross receipts", as used herein, is defined as the aggregate of all gross sales of Tenant and licensees, concessionaires, and sublessees of Tenant, from all business conducted upon or from the Premises. Such sales shall include, but not be limited to, the amounts received from the sale of goods, wares and merchandise and for services performed on or from the Premises, together with the amount of all orders taken or received at the Premises, whether such orders be filled therefrom or elsewhere, including without limitation all sales made pursuant to electronic mail, Internet, other electronic means, or other similar orders made from, received at, shipped from, or shipped to any location within 50 miles of the leased Premises, and shall include sales made from vending devices in the Premises. Cash refunds to purchasers or allowances made on merchandise claimed to be defective or unsatisfactory shall be deducted from gross sales to the extent that same were previously included in gross sales; and there shall be deducted from gross sales the sales price of merchandise returned by customers for exchange, provided that the sales price of merchandise delivered to the customer in exchange shall be included in gross sales. Gross sales shall not include any sales, use or gross receipts tax imposed by any federal, state, municipal or other governmental authority directly on sales and which must be paid by Tenant, whether or not collected from its customers. No franchise or capital stock tax and no income, occupation or similar tax or license fee based upon income, sales or profits shall be deducted from gross sales. All monies or other things of value accepted or received by or on behalf of Tenant not herein specifically excluded from gross receipts shall be deemed to be included herein.



Initials Landlord ______ Tenant ______

## SIGN ADDENDUM

1. All signs must be submitted in shop drawing form to Landlord and Landlord's architect for approval as to type, size, color and design prior to fabrication. Any sign being installed without approval and not meeting with the criteria of the Center will be removed and brought into compliance at the expense of Tenant. Tenant further agrees to maintain such sign, keep in good condition and repair at all times and will remove the same at the end of the term if requested by Landlord to do so. Upon removal thereof, Tenant agrees to repair any damage to the Premises caused by such installation.

2. If governmental approval is required, this is the responsibility of Tenant.

3. Signs shall be individual letters. Letters shall be either internally lit or reverse-lit as determined by Landlord.

4. No sign shall cover more than seventy-five percent (75%) of the store front width. Maximum height of letters shall be thirty-six inches (36").

5. No sign is to extend above the top of the fascia or be more than seventy-five percent (75%) of the height of the fascia. Letters shall not be located closer than four and one-half inches (4-1/2") to gutters or bottom of fascia.

6. Specific colors permitted will be as determined by Landlord.

7. Specific letter style will be as determined by Landlord.

8. No box signs, uncovered neon signs, etc. will be permitted. Landlord specifically prohibits placing any signs in the windows for the Premises, except such signage as shall indicate hours of operation. Tenant shall also not place any signage in the Common Areas of the Center.

9. All signs shall be adhered to the building in the manner specified by Landlord.

Notwithstanding anything herein to the contrary or Landlord's approval, all signs shall comply with the local laws, ordinances and sign regulations along with any sign restrictions affecting the land on which the Shopping Center is constructed, said compliance to be the responsibility of Tenant.



Initials Landlord ______ Tenant ______

**EXHIBIT LIST**

**Exhibit A – Site Plan Showing Shopping Center and Premises Location**

**Exhibit B – Retail Shops Typical Finish Criteria ("Landlord's Work")**

**Exhibit C – Special Stipulations**

**EXHIBIT A**

**Site Plan**

| | Landlord | Tenant |
| --- | --- | --- |
| Initials | [signature] | [signature] |



Initials Landlord Tenant

Initials Landlord Tenant

**EXHIBIT B**
**Landlord's Work**
**RETAIL SHOPS TYPICAL FINISH CRITERIA**

**Service/Utilities**
1. **Fire Sprinkler:** Fully operational, inspected and certified (including back flow test) system including flow detection devices and spray distribution sufficient to meet local ordinances, and positioned (upward or downward facing) per Tenant plans. Existing "As Is"

2. **Water:** 1.5" or greater domestic water supply line supplying a minimum of 75 gallons per minute at 60 PSI routed to within leased premises with any applicable impact and or capacity fees provided by the landlord. Landlord to disclose if water line is shared with any other tenants. Existing "As Is"

3. **Sewer:** 4" minimum sanitary sewer with any applicable impact and or capacity fees provided by the landlord.

4. **Gas:** minimum 3,000 CFH gas service at 7-inch water column and meter routed to within leased premises.

5. **Electrical:** One 400 amp, 120/208 volt, 3 phase, 4 wire electrical service at rear of leased space. Electric conduit and conductor to be brought to within leased premises.

6. **Telephone:** Two (2) 2" conduits stubbed in at the rear of the leased premises originating from property's joint telephone equipment room.

**Building:**
1. **Roof** - to be delivered without defects, leaks, or punctures.

2. **Demising Walls**- Provided/installed by landlord to be insulated, steel stud and gypsum board demising walls rated as required by local jurisdiction for business occupancy, storefront bulkhead, and rear wall all to underside of roof deck, sealed at top and bottom, taped and filled, sanded to a smooth finish and ready for paint. To be further defined prior to Lease regarding sound proofing.

3. **Floor Slab:**
b. For buildings where the floor slab is existing, the slab is to be delivered with previous Tenant's fixtures, floor sinks, floor drains and floor covering removed, and repaired with the existing slab to be smooth, level, and ready to accept Tenant's floor covering.

4. **Demolition of Space:**
a. Any existing improvements from previous Tenant shall be removed.

b. **Floor** - to be delivered with previous Tenant's floor covering removed and the existing slab shall be smooth, level, and ready to accept Tenant's floor covering.
c. Or a reimbursement of $6/SF for tenant demolition costs.

5. Interior clear height to bottom of structure to be at least 14'.

6. **HVAC** – Landlord to supply new HVAC system designed to accommodate Tenant's specific use. Specialized HVAC is needed to combat mold and mildew in locker rooms and high levels of humidity and carbon dioxide build up in exercise areas. A typical space will have 12 tons (1 ton/83 SF) of multi-stage cooling in the Exercise Studio and 6 tons (1 ton/250 SF) for the remainder of the space. Landlord to install the HVAC units. However, the Tenant shall supply all architectural and engineering drawings to the Landlord for installation of said units or like kind. Landlord's monetary responsibility shall be capped at

Initials Landlord Tenant

$14/sf. Should the price and installation of said units exceed this amount, the Tenant will use a portion of their Tenant Finish Allowance to cover the difference.

7. **Accessibility** - Landlord shall deliver space in compliance with all ADA laws including parking requirements, approaches, sidewalks, and ramps to the demised space.

8. **Contamination** - Space to be free of environmental contamination including, but not limited to lead paint and/or materials containing asbestos. De

9. **Site Development**-Provide any required traffic studies, traffic impact fees, parking analysis required for building permit or other site related fees or studies associated with the development or maintenance of the public infrastructure provided for the development that may be required by the authority having jurisdiction over the site.

10. **Multi-Level buildings** – Not Applicable

11. **New Construction**
a. **Restrooms** - In the event of new construction, tenant will install restrooms to meet tenant's specific layout requirement and receive additional credit of $3.50/SF in lieu of installing (2) unisex restrooms.
b. **Storefront System** – In the event of new construction, Landlord shall provide fully functioning storefront system to match base building storefront with operable single leaf door in a mutually agreeable location or credit in lieu of. If construction barricades are required, landlord shall provide at landlord's cost.

In addition to Landlord's Work, Landlord will provide Tenant with a Tenant Finish Allowance in the amount of Twenty Dollars ($20.00) per square foot of the Premises for permanent improvements to the Premises, which improvements shall be the property of Landlord. The Tenant Finish Allowance shall be paid within ten (10) days of the later of (a) the date Tenant opens the Premises for business, (b) Landlord's receipt of the first month's Minimum Rent for the Premises, (c) Landlord's receipt of lien waivers from Tenant's general contractor and/or subcontractors, (d) Landlord's receipt of as-built drawings for the Premises, and (e) Landlord's receipt of a copy of Tenant's certificate of occupancy for the Premises.

TENANT SHALL NOT DO ANY IMPROVEMENTS IN OR ABOUT THE PREMISES WITHOUT LANDLORD'S REVIEW AND APPROVAL OF TENANT'S PLANS. TENANT AND/OR TENANT'S CONTRACTOR SHALL NOT COMMENCE IMPROVEMENTS UNTIL IT PROVIDES LANDLORD WITH A COPY OF ITS BUILDING PERMIT (IF REQUIRED) AND A CERTIFICATE OF INSURANCE MEETING LANDLORD'S REQUIREMENTS. THE TENANT'S CONTRACTOR WILL BE BONDED. TENANT SHALL USE LANDLORD'S ROOFING CONTRACTOR, OR OTHER CONTRACTOR APPROVED BY LANDLORD, FOR ALL ROOF PENETRATIONS.

Initials Landlord ____ Tenant ____

## EXHIBIT C

## SPECIAL STIPULATIONS

Special Stipulations to this Lease are incorporated herein by reference and made a part hereof; where Special Stipulations conflict with the foregoing provisions of the Lease, said Special Stipulations shall control.

1. Permits. Tenant agrees to apply for permits within forty five (45) days of lease execution and will diligently pursue permits. In the event Tenant is unable to secure the required permits within sixty (60) days of application, Landlord may elect to assist Tenant. If neither party can obtain permits within one hundred twenty (120) days of initial application, either party may elect to terminate this Lease until such time the permits are obtained. It is acknowledged that on the date that either party obtains the permits, this termination right shall be null and void.

2. Black-Out Period. Tenant shall not be required to open the Premises to the public between May 1st and August 1st of the calendar year (the "Blackout Period"). In the event that Tenant elects to open the Premises during the Blackout Period, then Tenant shall pay fifty percent (50%) of the Base Rent and Additional Rent during said Blackout Period.

3. Exclusive Use. Provided that Tenant is not and has not been in default hereunder beyond any applicable cure periods and Tenant is open and operating in the Shopping Center, Landlord shall not lease any space within the Shopping Center to another tenant for use as a cycle studio or another health club which offers indoor cycling during the Term of this Lease. The foregoing restriction shall not apply to any tenant within the Shopping Center as of the date of this Lease. In the event a tenant, subtenant or occupant of the Shopping Center violates this provision Landlord shall use commercially reasonable efforts to cause such tenant to cease operations in violation of Tenant's exclusive use as herein granted after Landlord receives written notice from Tenant of said violation. In the event Landlord does not cure the same within thirty (30) days after Tenant notifies Landlord in writing of the violation, then provide that Tenant is not in monetary default hereunder, Minimum Rent and Additional Rent shall thereafter be reduced by fifty percent (50%) until such time as the breach is cured at which time the full Rent shall again be due and payable hereunder.

4. Tenant Termination Right. In the event that Tenant's sales have failed to reach $150 per square foot of the Premises or more during Lease Year 4(on a calendar year January-December) , then Tenant shall have a one (1) time right to terminate this Lease which shall be effective at the end of the 5th Lease Year (the "Early Termination Right"). In order to exercise the Early Termination Right, the Tenant must provide Landlord with a detailed accounting of financial information demonstrating the sales within the Premises for the entire Term (Lease Years 1-4) together with a statement of Tenant's intent to terminate this Lease on or before the date which is nine (9) months prior to the expiration of the fifth (5th) Lease Year. Further, if Tenant exercises the Early Termination Right, Tenant shall reimburse Landlord for one half of the Tenant Allowance paid to Tenant in Exhibit B together with one half of the leasing commissions Landlord paid in connection with this Lease (collectively, the "Termination Reimbursements"). Tenant shall pay the Termination Reimbursements to Landlord at the same time Tenant notifies Landlord of its election to terminate this Lease.

5. Parking. The Landlord agrees to provide the Tenant with their normal parking requirements of 5 spaces/1,000 square feet for the duration of their Lease term. The overall development will meet parking code requirements.

Initials Landlord ______ Tenant ______

# EXHIBIT B

Hatcher-Hill
Properties, LLC

May 18, 2020

JCM Kentucky Cycle LLC
dba Cycle Bar
Mr. John Janszen
135 E. Martin Street Suite 201
Raleigh, NC 27601 Sent Via Certified Mail 70191640000195301308

RE: Notice of Default, 5430 Homberg Drive now known as 5444 Homberg Drive, Knoxville, TN

Dear Mr. Janszen :

This letter serves as a Default Notice related to the Lease Agreement dated June 28, 2017 between Hatcher Hill II, LLC and JCM Kentucky Cycle, LLC. We have not received your rent payments that were due on April 1, 2020 and May 1, 2020. Pursuant to the Lease Agreement, Section 34 (Late Payments), interest is accrued at Prime + 2% and a late charge of $250.00 is due in addition to your balance due.

| | |
|---|---|
| May, 2020 Rent & CAM | $7,477.88 |
| May, 2020 Interest | 392.59 |
| May, 2020 Late Fees | 250.00 |
| April, 2020 Rent & CAM | $7,477.88 |
| April, 2020 Interest | $ 392.59 |
| April, 2020 Late Fee | $ 250.00 |
| Outstanding Balance | $3,832.83 |
| **BALANCE DUE** | **$20,073.77** |

Please remit a check in the amount of $20,073.77 immediately to avoid being in default of your lease. In the future, please remit $7,477.88 each month on or before the tenth of the month to avoid late fees and interest. If you have any questions, please feel free to contact me at 865-249-8132 or support@hatcherhill.com.

Sincerely,

Mary Katherine Wormsley
Hatcher Hill Properties, LLC

SCANNED

LEWIS S. HOWARD, JR.
DALLIS H. HOWARD
JOSHUA B. BISHOP

LEWIS S. HOWARD
(1930-2015)

LAW OFFICES
HOWARD & HOWARD

MATTHEW W. SHERROD
ERIN J. WALLEN
JESSEE E. BUNDY

June 16, 2020

Howard G. Hogan, Esq., Clerk & Master
Knox County Chancery Court
City County Building, Suite 125
400 West Main Street
Knoxville, Tennessee 37902

Re: ***Hatcher Hill II, LLC v. JCM Kentucky Cycle, LLC, Michael D. Olander, Jr. and John G. Janszen***
**Knox County Chancery Court, No. ____________**

Dear Mr. Hogan:

Enclosed for filing please find an original and two (2) copies of the Complaint and three (3) Summonses relative to the above captioned matter. Also enclosed is our check in the amount of $200.50 as payment of the filing fee applicable thereto. Please return the filed Complaint and Summonses to us in the pre-addressed postage paid envelope provided for your convenience and we will proceed to serve on the Defendants via private process server.

Should you have any questions, please do not hesitate to contact our office. Thank you.

Sincerely,

Joanna Nunley
Legal Assistant to Joshua B. Bishop

Enclosures

ORIGINAL

4820 OLD KINGSTON PIKE • KNOXVILLE, TENNESSEE 37919 • TELEPHONE (865) 588-4091 • TELEFAX (865) 588-4206
www.howardhowardlaw.com

FILED

**IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE**

2020 JUN 17 PM 3:38

HOWARD G. HOGAN

| | | |
|---|---|---|
| HATCHER HILL II, LLC<br><br>Plaintiff,<br>v.<br><br>JCM KENTUCKY CYCLE, LLC,<br>MICHAEL D. OLANDER, JR. and<br>JOHN G. JANSZEN<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 200401-3 |

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

**CIVIL SUMMONS**

To the above-named Defendant, **JCM KENTUCKY CYCLE, LLC:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 17 day of June 2020.

[signature]
Clerk

**NOTICE:**

To the Defendant(s):

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

## SERVICE INFORMATION

To the process server: Defendant, **JCM KENTUCKY CYCLE, LLC** can be served with process through **its registered agent, JCM Kentucky Cycle, LLC, at 5430 Homberg Drive, Knoxville, Tennessee 37919.**

## RETURN

I received this summons on the 23rd day of June 2020. I hereby certify that on the 23rd day of June 2020, I: Brittany Huskey

[ ✓ ] served this Summons and Complaint on Defendant, **JCM KENTUCKY CYCLE, LLC,** in the following manner: placed in hand to Rebecca Chambers manager of Cyclebar

[ ] failed to serve this Summons on Defendant, **JCM KENTUCKY CYCLE, LLC,** within 90 days after its issuance because: ____________________

Brittany Huskey
Process Server
Visions Private Investigations
4813 N Broadway
Knoxville TN 37918
865-382-0391

X Rebecca Chambers

FILED

IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE

2020 JUN 17 PM 3:38

HOWARD G. HOGAN

HATCHER HILL II, LLC )
)
Plaintiff, )
v. ) No. 200401-3 ✓
)
JCM KENTUCKY CYCLE, LLC, )
MICHAEL D. OLANDER, JR. and )
JOHN G. JANSZEN )
Defendants. )

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

## CIVIL SUMMONS

To the above-named Defendant, **JOHN G. JANSZEN:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 17 day of June 2020.

Clerk

## NOTICE:

To the Defendant(s):

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**SERVICE INFORMATION**

To the process server: Defendant, **JOHN G. JANSZEN** can be served with process at **4010 Finn Way, Suite 120, Lexington, Kentucky 40502.**

**RETURN**

I received this summons on the 24 day of June 2020. I hereby certify that on the 25 day of June 2020, I:

[ ] served this Summons and Complaint on Defendant, **JOHN G. JANSZEN,** in the following manner: ______________________________

[X] failed to serve this Summons on Defendant, **JOHN G. JANSZEN,** within 90 days after its issuance because: John Janszen is a franchise owner and his office is not located at address of 4010 Finn Way Suite 120 Lexington KY. Per employee he is located at main office but she did not know where that was at.

Leslie Remington

Process Server

IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE

2020 JUN 17 PM 3:38

HOWARD G. HOGAN

| | | |
|---|---|---|
| HATCHER HILL II, LLC<br><br>Plaintiff,<br>v.<br><br>JCM KENTUCKY CYCLE, LLC,<br>MICHAEL D. OLANDER, JR. and<br>JOHN G. JANSZEN<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 200401-3 |

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

**CIVIL SUMMONS**

To the above-named Defendant, **MICHAEL D. OLANDER, JR.:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 17 day of June 2020.

[signature]
Clerk

**NOTICE:**

To the Defendant(s):

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

**SERVICE INFORMATION**

To the process server: Defendant, **MICHAEL D. OLANDER, JR.** can be served with process at **135 E. Martin Street, Raleigh, North Carolina 27601.**

**RETURN**

I received this summons on the 28 day of June 2020. I hereby certify that on the 6th day of July 2020, I:

[ ] served this Summons and Complaint on Defendant, **MICHAEL D. OLANDER, JR.**, in the following manner: ____________________

[X] failed to serve this Summons on Defendant, **MICHAEL D. OLANDER, JR.**, within 90 days after its issuance because: on 6/29/20 at 11:50Am it was confirmed the listed address is a vacant commerical building. Attempts made at 3329 Granville DR Raleigh, NC 27609 7/1/20 at 5:57pm according to co-resident the subject was not home at that time. 7/2/20 at 7:50AM front gate locked no access to property

[signature]
Process Server
Domanique Glinton

7/3/20 at 12:30pm front gate locked no access to property. On 7/8/20 at 4:40pm this server made an attempt at 170 wind chime crt Raleigh, NC 27615. According to Michael Olander SR the subject does not work at that location.

FILED
2020 JUL -2 AM 11:02
HOWARD G. HOGAN

IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE

HATCHER HILL II, LLC )
)
Plaintiff, )
v. ) No. 200401-3
)
JCM KENTUCKY CYCLE, LLC, )
MICHAEL D. OLANDER, JR. and )
JOHN G. JANSZEN )
Defendants. )

## ALIAS CIVIL SUMMONS

To the above-named Defendant, **JOHN G. JANSZEN:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 2 day of July 2020.

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

Howard G. Hogan
Clerk

**NOTICE:**

To the Defendant(s):

TC Atty

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

FILED
2020 JUL -2 AM 11:02
HOWARD G. HOGAN

**IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE**

| | | |
|---|---|---|
| HATCHER HILL II, LLC<br><br>Plaintiff,<br>v.<br><br>JCM KENTUCKY CYCLE, LLC,<br>MICHAEL D. OLANDER, JR. and<br>JOHN G. JANSZEN<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 200401-3 |

**ALIAS CIVIL SUMMONS**

To the above-named Defendant, **JOHN G. JANSZEN:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 2 day of July 2020.

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

Clerk

**NOTICE:**

To the Defendant(s):

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

## SERVICE INFORMATION

To the process server: Defendant, **JOHN G. JANSZEN** can be served with process **3850 Foxtail Lane, Cincinnati, Ohio 45248.**

## RETURN

I received this summons on the 3 day of July 2020. I hereby certify that on the 3 day of July 2020, I:

[ X ] served this Summons and Complaint on Defendant, **JOHN G. JANSZEN**, in the following manner: by substitute / residential service upon Donna Janzen, spouse of John G. Janszen at 3850 Foxtail Lane Cincinnati, OH 45248. Documents served per Tenn. Rule 405(2) and OH Civ. Rule 4.1(C).

[ ] failed to serve this Summons on Defendant, **JOHN G. JANSZEN**, within 90 days after its issuance because: ______

Process Server, VICTORIA AMMANN
513-477-6212

FILED
2020 JUL 13 PM 2:54
HOWARD G. HOGAN

**IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE**

| | | |
|---|---|---|
| HATCHER HILL II, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 200401-3 |
| | ) | |
| JCM KENTUCKY CYCLE, LLC, | ) | |
| MICHAEL D. OLANDER, JR. and | ) | |
| JOHN G. JANSZEN | ) | |
| Defendants. | ) | |

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

**ALIAS CIVIL SUMMONS**

To the above-named Defendant, **MICHAEL D. OLANDER, JR.:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 13 day of July 2020.

Clerk

TO: Atty

**NOTICE:**

To the Defendant(s):

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

IN THE CHANCERY COURT FOR KNOX COUNTY, TENNESSEE

| | | |
|---|---|---|
| HATCHER HILL II, LLC<br><br>Plaintiff,<br>v.<br><br>JCM KENTUCKY CYCLE, LLC,<br>MICHAEL D. OLANDER, JR. and<br>JOHN G. JANSZEN<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 200401-3 |

2020 JUL 13 PM 2:54

ADA
FOR ASSISTANCE CALL
865 / 215-2952
TTY: 865 / 215-2497

ALIAS CIVIL SUMMONS

To the above-named Defendant, **MICHAEL D. OLANDER, JR.:**

You are hereby summoned and required to serve upon Joshua B. Bishop, Esq., Plaintiff's attorney, whose address is Howard & Howard, P.C., 4820 Old Kingston Pike, Knoxville, Tennessee 37919, an answer to the Complaint herewith served upon you within 30 days after service of this Summons and Complaint upon you, exclusive of the day of service. If you fail to do so, judgment by default can be taken against you for the relief demanded in the Complaint.

Witnessed and issued, Howard G. Hogan, Clerk for said Court at office this 13 day of July 2020.

Clerk

**NOTICE:**

To the Defendant(s):

Tennessee law provides a ten thousand dollar ($10,000) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel for yourself and your family, and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand this exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

## SERVICE INFORMATION

To the process server: Defendant, **MICHAEL D. OLANDER, JR.** can be served with process at **3329 Granville Drive, Raleigh, North Carolina 27609.**

## RETURN

I received this summons on the 15th day of July 2020. I hereby certify that on the 15th day of July 2020, I:

[✓] served this Summons and Complaint on Defendant, **MICHAEL D. OLANDER, JR.**, in the following manner: personal service at his residence at 7:51pm

[ ] failed to serve this Summons on Defendant, **MICHAEL D. OLANDER, JR.**, within 90 days after its issuance because: __________

____________________

Process Server

# G.S. § 10B-41 NOTARIAL CERTIFICATE FOR ACKNOWLEDGMENT

Wake County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Brian Lee.

*Name(s) of principal(s)*

Date: July 15, 2020

(Official Seal)

NANCY L ARMSTRONG
NOTARY PUBLIC
WAKE COUNTY, N.C.

*Official Signature of Notary*

Nancy L. Armstrong, Notary Public

*Notary's printed or typed name*

My commission expires: 12-16-2020

LEWIS S. HOWARD, JR.
DALLIS H. HOWARD
JOSHUA B. BISHOP

LEWIS S. HOWARD
(1930-2015)

LAW OFFICES
HOWARD & HOWARD

MATTHEW W. SHERROD
ERIN J. WALLEN
JESSEE E. BUNDY

July 21, 2020

Howard G. Hogan, Esq., Clerk & Master
Knox County Chancery Court
City County Building, Suite 125
400 West Main Street
Knoxville, Tennessee 37902

Re: *Hatcher Hill II, LLC v. JCM Kentucky Cycle, LLC, Michael D. Olander, Jr. and John G. Janszen*
**Knox County Chancery Court, No. 200401-3**

Dear Mr. Hogan:

Enclosed for filing is a Summons with the return of service on Defendant, Michael D. Olander, Jr., in regard to the above referenced matter. Please return a filed marked copy of the same in the self-addressed, postage prepaid envelope provided for your convenience.

Should you have any questions, please do not hesitate to contact our office. Thank you.

Sincerely,

Joanna Nunley
Legal Assistant to Joshua B. Bishop

Enclosures

4820 OLD KINGSTON PIKE • KNOXVILLE, TENNESSEE 37919 • TELEPHONE (865) 588-4091 • TELEFAX (865) 588-4206
www.howardhowardlaw.com